UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

TYLER MARSHALL,

                    Plaintiff,                          Case No. 1:24-cv-797

v.                                                      Honorable Ray Kent

R. REWERTS et al.,

                    Defendants.
_____/

## **OPINION**

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis* in a separate order. Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, Plaintiff consented to proceed in all matters in this action under the jurisdiction of a United States magistrate judge. (ECF No. 11.)

This case is presently before the Court for preliminary review under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court is required to conduct this initial review prior to the service of the complaint. *See In re Prison Litig. Reform Act*, 105 F.3d 1131, 1131, 1134 (6th Cir. 1997); *McGore v. Wrigglesworth*, 114 F.3d 601, 604–05 (6th Cir. 1997). Service of the complaint on the named defendants is of particular significance in defining a putative defendant's relationship to the proceedings.

"An individual or entity named as a defendant is not obliged to engage in litigation unless notified of the action, and brought under a court's authority, by formal process." *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347 (1999). "Service of process, under

longstanding tradition in our system of justice, is fundamental to any procedural imposition on a named defendant." *Id.* at 350. "[O]ne becomes a party officially, and is required to take action in that capacity, only upon service of a summons or other authority-asserting measure stating the time within which the party served must appear and defend." *Id.* (citations omitted). That is, "[u]nless a named defendant agrees to waive service, the summons continues to function as the *sine qua non* directing an individual or entity to participate in a civil action or forgo procedural or substantive rights." *Id.* at 351. Therefore, the PLRA, by requiring courts to review and even resolve a plaintiff's claims before service, creates a circumstance where there may only be one party to the proceeding—the plaintiff—at the district court level and on appeal. *See, e.g.*, *Conway v. Fayette Cnty. Gov't*, 212 F. App'x 418 (6th Cir. 2007) ("Pursuant to 28 U.S.C. § 1915A, the district court screened the complaint and dismissed it without prejudice before service was made upon any of the defendants . . . [such that] . . . only [the plaintiff] [wa]s a party to this appeal.").

Here, Plaintiff has consented to a United States magistrate judge conducting all proceedings in this case under 28 U.S.C. § 636(c). That statute provides that "[u]pon the consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings . . . and order the entry of judgment in the case . . . ." 28 U.S.C. § 636(c). Because the named Defendants have not yet been served, the undersigned concludes that they are not presently parties whose consent is required to permit the undersigned to conduct a preliminary review under the PLRA, in the same way they are not parties who will be served with or given notice of this opinion. *See Neals v. Norwood*, 59 F.3d 530, 532 (5th Cir. 1995) ("The record does not contain a

consent from the defendants[; h]owever, because they had not been served, they were not parties to th[e] action at the time the magistrate entered judgment.").[1]

Under the PLRA, the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).

Applying these standards, the Court will dismiss Plaintiff's federal claims for failure to state a claim. Plaintiff's state law claims will be dismissed without prejudice because the Court declines to exercise supplemental jurisdiction over such claims. The Court will also deny Plaintiff's motion to appoint counsel. (ECF No. 5.)

<u>Discussion</u>

## I.   Factual Allegations

Plaintiff is presently incarcerated with the MDOC at the Muskegon Correctional Facility (MCF) in Muskegon, Muskegon County, Michigan. The events about which he complains, however, occurred at the Carson City Correctional Facility (DRF) in Carson City, Montcalm County, Michigan. Plaintiff sues the following DRF employees in their official and personal

---

[1] *But see Coleman v. Lab. & Indus. Rev. Comm'n of Wis.*, 860 F.3d 461, 471 (7th Cir. 2017) (concluding that, when determining which parties are required to consent to proceed before a United States magistrate judge under 28 U.S.C. § 636(c), "context matters" and the context the United States Supreme Court considered in *Murphy Bros.* was nothing like the context of a screening dismissal pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c)); *Williams v. King*, 875 F.3d 500, 503–04 (9th Cir. 2017) (relying on Black's Law Dictionary for the definition of "parties" and not addressing *Murphy Bros.*); *Burton v. Schamp*, 25 F.4th 198, 207 n.26 (3d Cir. 2022) (premising its discussion of "the term 'parties' solely in relation to its meaning in Section 636(c)(1), and . . . not tak[ing] an opinion on the meaning of 'parties' in other contexts").

3

capacities: (1) Warden R. Rewerts; (2) Assistant Deputy Wardens K. Nevins and Unknown Garda; and (3) Correctional Officers S. Fleisher, Unknown Pierce, Joshua Ray, and James Findlay. Plaintiff also sues the following DRF correctional officers in their personal capacities only: J. Kissell, A. Hitchingham, A. Town, D. Smith, Unknown Durga, Unknown Silvhy, Unknown Melius, Unknown Hord, Unknown Town, Unknown Cook, Unknown Acala, Unknown McNeil, Unknown Sopcy, Unknown Henderson, Unknown Haggerty, Unknown Has, Unknown Denz, Unknown Allen, and Unknown Parties #1, #2, #3, and #4.

Plaintiff alleges that he arrived at DRF on August 22, 2023. (Compl., ECF No. 1, PageID.7.) At the time, Plaintiff had a pending grievance regarding retaliation and harassment against non-party Officer Hill at the Cooper Street Correctional Facility (JCS) in Jackson, Jackson County, Michigan. (*Id.*) When he arrived at DRF, Plaintiff submitted a law library request for copies of the grievance, but his request was denied. (*Id.*) According to Plaintiff, Defendants Kissell and Hitchingham "deliberately denied [his] copy request, stating colorable alterations in response to protect their co-worker, [Officer] Hill, from being sued." (*Id.*) Plaintiff claims that Defendants Garda and Rewerts were also aware of this "false altered response" because they responded to Plaintiff's grievance about the issue at Steps I and II. (*Id.*)

Plaintiff claims that after he filed a grievance against Defendant Kissell and Hitchingham, their coworkers "repeatedly harassed [P]laintiff on a regular basis causing fright, shock, harm, embarrassment, humiliation[,] and ultimately wanton infliction of pain and injury." (*Id.*, PageID.8.) Specifically, Plaintiff alleges that Defendants A. Town, Smith, and Durga conducted "multiple calculated shakedowns without penological justification" to retaliate against Plaintiff for filing the grievance. (*Id.*) In an exhibit attached to his complaint, Plaintiff asserts that Defendants McNeil, Melius, Hord, Cook, Silvhy, Henderson, Has, Denz, Haggerty, Allen, and other officers

(unknown because their names were covered) were also involved in the multiple shakedowns. (ECF No. 1-7, PageID.43–45.)

Plaintiff asked Defendant Findlay why so many shakedowns were occurring, and Defendant Findlay responded, "[You're] being [shaken] down so much because people are going home, but it'll stop soon." (Compl., ECF No. 1, PageID.8.) Plaintiff contends, however, that it did not stop and instead "got worse, like almost everyday or every other day, sometimes two or three times a day." (*Id.*) He contends that personal property was destroyed during these shakedowns, "i.e., punched holes in coffee bags, cool-aid bags, destroying and ripping apart binder/folder(s) that had only religious material in it, etc." (*Id.*)

Plaintiff filed a grievance about the shakedowns on January 5, 2024. (*Id.*, PageID.9.) Afterwards, Defendant Findlay told Plaintiff, "We can shake you down whenever we [feel] like it at any time." (*Id.*) Plaintiff contends that Defendants Rewerts and Nevins knew about the ongoing harassment and did nothing to stop it because they responded to the grievance at Steps I and II. (*Id.*)

Plaintiff goes on to allege that, starting on January 15, 2024, Defendants Findlay and Fleisher retaliated against him by writing misconduct tickets and denying Plaintiff's right to "appeal forms" so that he could appeal misconduct ticket proceedings. (*Id.*) During one ticket review, Defendant Findlay told Plaintiff, "You better sign that ticket and accept those five days of LOP (Loss of Privileges) [you are] being offered, because [you are] not getting any hearing, and if you ask for a hearing again, I'm just [going to] give you more LOP days just for asking for a hearing." (*Id.*) Plaintiff claims that Defendant Findlay sanctioned him with 20 days' LOP. (*Id.*)

Defendant Fleisher reviewed another misconduct ticket with Plaintiff and "found that Officer D. Smith had lied on the misconduct report." (*Id.*) Plaintiff claims that Defendant Fleisher

said he was going to find Plaintiff guilty anyway, and denied him appeal forms to appeal the decision. (*Id.*) Plaintiff filed a grievance against Defendants Findlay and Fleisher. (*Id.*, PageID.9–10.)

Plaintiff was transferred from Unit B to Unit G on April 10, 2024. (*Id.*, PageID.10.) Plaintiff claims this move was retaliatory because "the Administration specifically had Unit G opened and sent [Plaintiff] to that unit in retaliation for filing grievances." (*Id.*) According to Plaintiff, "Unit G barely had pressure, that it was so low, that [they could not] take showers." (*Id.*) Two days before the move, Defendant Findlay asked Plaintiff, "Why are you setting up all of these lawsuits?" (*Id.*) He also said, "I don't care about being sued, do you know how many times I've been sued?" (*Id.*)

On April 17, 2024, Defendant Nevins and several corrections officers "stormed Unit G" and conducted a strip search of half the unit. (*Id.*) Plaintiff was included in the search. (*Id.*) He claims that the search caused him "fright, shock[,] and humiliation" and was also retaliatory. (*Id.*)

Plaintiff goes on to state that Defendant Ray was the Unit G prison counselor/assistant resident unit manager from April 28, 2024. (*Id.*) Plaintiff contends that Defendant Ray did not discuss with him the possibility of a transfer to a higher security level. (*Id.*, PageID.11.) According to Plaintiff, such a move could affect his parole eligibility at his "up-and-coming parole hearing." (*Id.*) According to Plaintiff, Defendants Ray, Fleisher, and Pierce transferred him from Level I at DRF to Level II at MCF, where he was placed in a cell "with a Lifer," placing him "at risk of potential danger." (*Id.*) Plaintiff claims the transfer occurred the same week that he had a visit scheduled, but he was moved "further and further away from his family and friends." (*Id.*) Plaintiff further alleges that he has been denied institutional employment, as well as college and/or other

vocational programs, which "implement[s] a negative and unfavorable view for timely release at his up-and-coming [p]arole [b]oard [h]earing." (*Id.*, PageID.11–12.)

Based upon the foregoing, Plaintiff asserts First, Fourth, Eighth, and Fourteenth Amendment claims. (*Id.*, PageID.12–16.) He also asserts negligence claims under state law and the Michigan Constitution. (*Id.*) Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive damages. (*Id.*, PageID.16–17.)

## II.    Motion to Appoint Counsel

Plaintiff has filed a motion to appoint counsel to represent him in this matter. (ECF No. 5.) Indigent parties in civil cases have no constitutional right to a court-appointed attorney. *Abdur-Rahman v. Mich. Dep't of Corr.*, 65 F.3d 489, 492 (6th Cir. 1995); *Lavado v. Keohane*, 992 F.2d 601, 604–05 (6th Cir. 1993). The Court may, however, request an attorney to serve as counsel, in the Court's discretion. *Abdur-Rahman*, 65 F.3d at 492; *Lavado*, 992 F.2d at 604–05; *see Mallard v. U.S. Dist. Ct.*, 490 U.S. 296 (1989).

Appointment of counsel is a privilege that is justified only in exceptional circumstances. In determining whether to exercise its discretion, the Court should consider the complexity of the issues, the procedural posture of the case, and Plaintiff's apparent ability to prosecute the action without the help of counsel. *See Lavado*, 992 F.2d at 606. The Court has carefully considered these factors and determines that the assistance of counsel does not appear necessary to the proper presentation of Plaintiff's position. Accordingly, Plaintiff's motion to appoint counsel (ECF No. 5) will be denied.

## III.    Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint

need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii).

## A.      Section 1983 Claims

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### 1.     Official Capacity Claims

As noted *supra*, Plaintiff sues the following DRF employees in their official and personal capacities: (1) Warden R. Rewerts; (2) Assistant Deputy Wardens K. Nevins and Unknown Garda; and (3) Correctional Officers S. Fleisher, Unknown Pierce, Joshua Ray, and James Findlay.

Although an action against a defendant in his or her individual capacity intends to impose liability on the specified individual, an action against the same defendant in his or her official capacity intends to impose liability only on the entity that they represent. *See Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). A suit against an individual in his official capacity is equivalent to a suit brought against the governmental entity: in this case, the MDOC. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). The states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1994). Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court. *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). In numerous opinions, the United States Court of Appeals for the Sixth Circuit has specifically held that the MDOC is absolutely immune from a § 1983 suit under the Eleventh Amendment. *See, e.g.*, *Harrison v. Michigan*, 722 F.3d 768, 771 (6th Cir. 2013); *McCoy v. Michigan*, 369 F. App'x 646, 653–54 (6th Cir. 2010).

Here, Plaintiff seeks declaratory and injunctive relief, as well as damages. Official capacity defendants, however, are absolutely immune from monetary damages. *See Will*, 491 U.S. at 71; *Turker v. Ohio Dep't of Rehab. & Corr.*, 157 F.3d 453, 456 (6th Cir. 1988). Defendants Rewerts,

Nevins, Garda, Fleisher, Pierce, Ray, and Findlay are, therefore, entitled to immunity with respect to Plaintiff's official capacity claims for damages.

Although damages claims against official capacity defendants are properly dismissed, an official capacity action seeking injunctive or declaratory relief constitutes an exception to sovereign immunity. *See Ex Parte Young*, 209 U.S. 123, 159–60 (1908) (holding that the Eleventh Amendment immunity does not bar prospective injunctive relief against a state official). The United States Supreme Court has determined that a suit under *Ex Parte Young* for prospective injunctive relief should not be treated as an action against the state. *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985). Instead, the doctrine is a fiction recognizing that unconstitutional acts cannot have been authorized by the state and therefore cannot be considered done under the state's authority. *Pennhurst State Sch. & Hosp.,* 465 U.S. at 114 n.25.

Nonetheless, the Supreme Court has cautioned that "*Ex parte Young* can only be used to avoid a state's sovereign immunity when a 'complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Ladd v. Marchbanks*, 971 F.3d 574, 581 (6th Cir. 2020) (quoting *Verizon Md. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). In *Green v. Mansour*, 474 U.S. 64 (1985), the Supreme Court explained why the doctrine of *Ex parte Young* could not be extended to authorize retrospective relief:

> Both prospective and retrospective relief implicate Eleventh Amendment concerns, but *the availability of prospective relief of the sort awarded in *Ex parte Young* gives life to the Supremacy Clause. Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law. *See Pennhurst, supra*, 465 U.S. at 102. *See also Milliken v. Bradley*, 433 U.S. 267 (1977). But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment.

*Id*. at 68.

Here, Plaintiff does not allege the existence of an official policy or practice that Defendants continue to enforce. Nor does he suggest that the actions alleged in the complaint are likely to

10

happen to him again. Instead, Plaintiff's allegations relate solely to past harm, not future risk of harm. Plaintiff, therefore, does not seek relief properly characterized as prospective. *See Ladd*, 971 F.3d at 581. Furthermore, the Sixth Circuit has held that transfer to another correctional facility moots a prisoner's claims for injunctive and declaratory relief. *See Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996). Here, Plaintiff is no longer confined at DRF, where he avers Defendants Rewerts, Nevins, Garda, Fleisher, Pierce, Ray, and Findlay are employed. Plaintiff, therefore, cannot maintain his claims for declaratory and injunctive relief against Defendants Rewerts, Nevins, Garda, Fleisher, Pierce, Ray, and Findlay, and the Court will dismiss these claims.

Accordingly, for the reasons set forth above, Plaintiff's official capacity claims, as well as any personal capacity claims for declaratory and injunctive relief, against Defendants Rewerts, Nevins, Garda, Fleisher, Pierce, Ray, and Findlay will be dismissed.[2]

### 2.    Personal Capacity Claims

#### a.    Claims Against Defendants Unknown Town, Acala, Sopcy, and Unknown Parties #1, #2, #3, and 4

As an initial mater, Plaintiff fails to mention Defendants Unknown Town, Acala, Sopcy, and Unknown Parties #1, #2, #3, and #4 in the body of his complaint, much less allege that they took any action against him. Although Plaintiff's one exhibit indicates that certain unknown officers participated in the alleged excessive shakedowns of Plaintiff's cell, nowhere in Plaintiff's complaint are there any facts alleged from which the Court could infer that these officers are the ones that Plaintiff refers to as Unknown Parties #1, #2, #3, and #4.

Where a person is named as a defendant without an allegation of specific conduct, the complaint is subject to dismissal, even under the liberal construction afforded to *pro se* complaints.

---

[2] For the same reasons, any personal capacity claims for declaratory and injunctive relief against the other named Defendants will also be dismissed.

*See Gilmore v. Corr. Corp. of Am.*, 92 F. App'x 188, 190 (6th Cir. 2004) (dismissing complaint where plaintiff failed to allege how any named defendant was involved in the violation of his rights); *Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (dismissing the plaintiff's claims where the complaint did not allege with any degree of specificity which of the named defendants were personally involved in or responsible for each alleged violation of rights). Plaintiff's claims against Defendants Unknown Town, Acala, Sopcy, and Unknown Parties #1, #2, #3, and #4, therefore, fall short of the minimal pleading standards under Rule 8 of the Federal Rules of Civil Procedure and are subject to dismissal for that reason alone. *See* Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief").

### b.      Defendants Rewerts, Nevins, and Garda

Plaintiff suggests that Defendants Rewerts, Nevins, and Garda violated his constitutional rights by rejecting the grievances he submitted about the other named Defendants' actions.

Government officials, however, may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell*, 436 U.S. at 691; *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter*, 532 F.3d at 575–76; *Greene*, 310 F.3d at 899. The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

The Sixth Circuit repeatedly has summarized the minimum required to constitute active conduct by a supervisory official:

> "[A] supervisory official's failure to supervise, control or train the offending individual is not actionable *unless* the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Shehee*, 199 F.3d at 300 (emphasis added) (internal quotation marks omitted). We have interpreted this standard to mean that "at a minimum," the plaintiff must show that the defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."

*Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (quoting *Shehee*, 199 F.3d at 300, and citing *Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008)); *see also Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995) (citing *Rizzo v. Goode*, 423 U.S. 362, 375–76 (1976), and *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)); *Walton v. City of Southfield*, 995 F.2d 1331, 1340 (6th Cir. 1993); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989).

Here, Plaintiff fails to allege any facts suggesting that Defendants Rewerts, Nevins, and Garda encouraged or condoned the conduct of any of their subordinates, or knowingly acquiesced in that conduct. Moreover, to the extent Plaintiff avers that Defendants Rewerts, Nevins, and Garda failed to act upon his grievances, that is insufficient to impose § 1983 liability. *See Summers*, 368 F.3d at 888; *Shehee*, 199 F.3d at 300. In any event, Plaintiff has no due process right to file a grievance. The courts repeatedly have held that there exists no constitutionally protected due process right to an effective prison grievance procedure. *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.,* 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569–70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases). Michigan law does not create a liberty interest in the grievance procedure. *See Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th

Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994). Because Plaintiff has no liberty interest in the grievance process, Defendants Rewerts, Nevins, and Garda did not deprive Plaintiff of due process by rejecting his grievances.

Furthermore, Plaintiff's First Amendment right to petition the government was not violated by Defendants Rewerts, Nevins, and Garda's conduct during the grievance review process. The First Amendment "right to petition the government does not guarantee a response to the petition or the right to compel government officials to act on or adopt a citizen's views." *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999); *see also Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 285 (1984) (holding the right to petition protects only the right to address government; the government may refuse to listen or respond).

Finally, Defendants Rewerts, Nevins, and Garda's actions (or inactions) have not barred Plaintiff from seeking a remedy for his complaints. *See Cruz v. Beto*, 405 U.S. 319, 321 (1972). Indeed, Plaintiff's ability to seek redress is underscored by his *pro se* invocation of the judicial process. *See Azeez v. DeRobertis*, 568 F. Supp. 8, 10 (N.D. Ill. 1982). Even if Plaintiff had been improperly prevented from filing a grievance, his right of access to the courts to petition for redress of his grievances (i.e., by filing a lawsuit) cannot be compromised by his inability to file institutional grievances, and he therefore cannot demonstrate the actual injury required for an access-to-the-courts claim. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 355 (1996) (requiring actual injury); *Bounds v. Smith*, 430 U.S. 817, 821–24 (1977). The exhaustion requirement only mandates exhaustion of *available* administrative remedies. *See* 42 U.S.C. § 1997e(a). If Plaintiff were improperly denied access to the grievance process, the process would be rendered unavailable, and exhaustion would not be a prerequisite for initiation of a civil rights action. *See Ross v. Blake*, 578 U.S. 632, 640–44 (2016) (reiterating that, if the prisoner is barred from pursuing a remedy by

14

policy or by the interference of officials, the grievance process is not available, and exhaustion is not required); *Kennedy v. Tallio,* 20 F. App'x 469, 470–71 (6th Cir. 2001).

In light of the foregoing, Plaintiff has failed to set forth cognizable claims against Defendants Rewerts, Nevins, and Garda, and Plaintiff's complaint against them will be dismissed.

### c.  First Amendment Claims

#### i.  *Access to the Courts*

Plaintiff contends that Defendants Kissell and Hitchingham violated his First Amendment right to access the courts by refusing to provide copies of a grievance Plaintiff had filed regarding Officer Hill at JCS. (ECF No. 1-1, PageID.23–24.)

It is well established that prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977). The principal issue in *Bounds* was whether the states must protect the right of access to the courts by providing law libraries or alternative sources of legal information for prisoners. *Id.* at 817. The Court further noted that in addition to law libraries or alternative sources of legal knowledge, the states must provide indigent inmates with "paper and pen to draft legal documents, notarial services to authenticate them, and with stamps to mail them." *Id.* at 824–25.

An indigent prisoner's constitutional right to legal resources and materials is not, however, without limit. In order to state a viable claim for interference with his access to the courts, a plaintiff must show "actual injury." *Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999); *Knop*, 977 F.2d at 1000. In other words, a plaintiff must plead and demonstrate that the shortcomings in the prison legal assistance program or lack of legal materials have hindered, or are presently hindering, his efforts to pursue a nonfrivolous legal claim. *Lewis*, 518 U.S. at 351–53; *see also Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir.

15

1996). The Supreme Court has strictly limited the types of cases for which there may be an actual injury:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis*, 518 U.S. at 355. "Thus, a prisoner's right to access the courts extends to direct appeals, habeas corpus applications, and civil rights claims only." *Thaddeus-X v. Blatter*, 175 F.3d 378, 391 (6th Cir. 1999). Moreover, the underlying action must have asserted a non-frivolous claim. *Lewis*, 518 U.S. at 353; *accord Hadix v. Johnson*, 182 F.3d 400, 405 (6th Cir. 1999) (discussing that *Lewis* changed actual injury to include requirement that action be non-frivolous).

In addition, the Supreme Court squarely has held that "the underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (citing *Lewis*, 518 U.S. at 353 & n.3). "Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Id.* at 415.

As an initial matter, Plaintiff's complaint and exhibits do not contain allegations concerning the underlying cause of action for his access to the courts claims. As noted above, Plaintiff asked Defendants Kissell and Hitchingham to make copies of a grievance that Plaintiff had filed against Officer Hill at JCS. Presumably, Plaintiff wanted the copies to file a civil rights lawsuit against Officer Hill. The Court assumes, therefore, that Plaintiff has alleged an underlying cause of action to which the right to access the courts extends. *See Thaddeus-X*, 175 F.3d at 391.

In any event, Plaintiff fails to allege facts suggesting that the lack of copies resulted in any lost remedy. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 578 (6th Cir. 2005) ("Examples of actual prejudice to pending or contemplated litigation include having a case dismissed, being unable to file a complaint, and missing a court-imposed deadline." (citing *Jackson v. Gill*, 92 F. App'x 171, 173 (6th Cir. 2004))). Plaintiff does not allege any facts from which the Court could infer that he had a civil rights lawsuit dismissed or that he was unable to file a complaint solely because Defendants Kissell and Hitchingham did not provide the requested copies of the grievance to him.

Because Plaintiff has failed to show any lost remedy, he has failed to state a claim for denial of access to the courts. Accordingly, his First Amendment access to the courts claims against Defendants Kissell and Hitchingham will be dismissed.

### ii.      Retaliation

Plaintiff contends that numerous Defendants violated his First Amendment rights by retaliating against him in several ways. Specifically, Plaintiff suggests that he was retaliated against for filing grievances by: (1) being denied copies of his grievance; (2) being subjected to numerous shakedowns of his cell; (3) receiving misconducts; (4) being moved to Unit G; (5) being transferred to MCF; and (6) being subjected to a strip search.

In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *See Thaddeus-X*, 175 F.3d at 394. Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250

F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Plaintiff engaged in protected conduct when he filed grievances. *See id.*; *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). The Court must next consider whether Plaintiff was subjected to adverse action. To establish the second element of a retaliation claim, a prisoner-plaintiff must show adverse action by a prison official sufficient to deter a person of ordinary firmness from exercising his constitutional rights. *Thaddeus-X*, 175 F.3d at 396. The adverseness inquiry is an objective one and does not depend on how a particular plaintiff reacted. The relevant question is whether the defendants' conduct is "*capable* of deterring a person of ordinary firmness"; the plaintiff need not show actual deterrence. *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002) (emphasis in original). The Court, therefore, will consider whether each asserted action above qualifies as adverse action and, if it does, whether Plaintiff has alleged sufficient facts regarding retaliatory motive for each involved Defendant.

### a.    Denial of Copies

Plaintiff suggests that Defendants Kissell and Hitchingham denied him copies of his grievance concerning Officer Hill because Plaintiff had filed that grievance. (Compl., ECF No. 1, PageID.13.) The Sixth Circuit, however, has held that an isolated incident of refusing to photocopy a prisoner's documents is "not likely to deter a person of ordinary firmness from pressing on with his lawsuit." *Smith v. Yarrow*, 78 F. App'x 529, 541 (6th Cir. 2003). Plaintiff, therefore, does not adequately allege that Defendants Kissell and Hitchingham's denial of copies amounted to adverse action.

Furthermore, Plaintiff utterly fails to allege facts suggesting that Defendants Kissell and Hitchingham's refusal to provide the copies was motivated by Plaintiff's protected conduct. It is

well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987). "[A]lleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108. "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538–39 (6th Cir. 1987)); *see also Murray v. Unknown Evert*, 84 F. App'x 553, 556 (6th Cir. 2003) (in complaints screened pursuant to 28 U.S.C. § 1915A, "[c]onclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial" (internal quotation marks omitted)); *Lewis v. Jarvie*, 20 F. App'x 457, 459 (6th Cir. 2001) ("[B]are allegations of malice on the defendants' parts are not enough to establish retaliation claims [that will survive § 1915A screening]." (citing *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998))). Although Defendants Kissell and Hitchingham were obviously aware of the grievance Plaintiff had filed because that is the document he asked to be copied, he merely alleges the ultimate fact of retaliation with respect to Defendants Kissell and Hitchingham. Plaintiff has not presented any facts to support his conclusory assertion that they denied the copies because Plaintiff had exercised his First Amendment rights.

For the foregoing reasons, Plaintiff's First Amendment retaliation claims against Defendants Kissell and Hitchingham premised upon the denial of copies will be dismissed.

### b. Shakedowns

Plaintiff also alleges that the numerous shakedowns and searches conducted of his cell, several of which left items of his personal property damaged, were retaliatory. A cell search may be considered sufficiently adverse to satisfy the adverse-action requirement of *Thaddeus-X*, where

the search leaves the cell in disarray and results in the confiscation or destruction of materials. *See Bell*, 308 F.3d at 606 (citing *Walker v. Bain*, 257 F.3d 660, 664 (6th Cir. 2001)).

Plaintiff, however, merely alleges the ultimate fact of retaliation with respect to the shakedowns and searches. He does not set forth any facts from which the Court could infer that any of the named Defendants involved in conducting the shakedowns and searches conducted them because of Plaintiff's grievance activity. Moreover, while in some circumstances, temporal proximity "may be 'significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive,'" *Muhammad v. Close*, 379 F.3d 413, 417–18 (6th Cir. 2004) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004)), "[c]onclusory allegations of temporal proximity are not sufficient to show a retaliatory motive." *Skinner v. Bolden*, 89 F. App'x 579, 580 (6th Cir. 2004). The Sixth Circuit has been reluctant to find that temporal proximity between the filing of a grievance and an official's adverse conduct, standing alone, is sufficient to establish a retaliation claim. *Hill v. Lappin*, 630 F.3d 468, 476 (6th Cir. 2010).

Plaintiff offers no facts regarding a retaliatory motive other than the temporal proximity between the shakedowns and his grievances. Generally, such allegations are insufficient to state a retaliation claim. Moreover, Plaintiff's exhibit suggests that the shakedowns occurred over a six-month period. (ECF No. 1-7.) Thus, many of the searches occurred several weeks after Plaintiff's grievance activity. Thus, temporal proximity alone is insufficient to support an inference of retaliatory motive. Plaintiff's First Amendment retaliation claims premised upon the shakedowns and searches of his cell will, therefore, be dismissed.

### c.    Misconducts

Plaintiff next contends that Defendants Findlay and Fleisher issued him retaliatory misconduct tickets. (Compl., ECF No. 1, PageID.9.) According to Plaintiff, one of the tickets was written based upon a false misconduct report prepared by Defendant Smith. (*Id.*)

The issuance of a misconduct ticket, and the resulting conviction and sanctions, can also be considered adverse action. *See Thomas v. Eby*, 481 F.3d 434, 441 (6th Cir. 2007); *see also Hill*, 630 F.3d at 474 (holding that "actions that result in more restrictions and fewer privileges for prisoners are considered adverse"). Plaintiff, however, has alleged no facts from which the Court could infer that Defendants Findlay and Fleisher issued the misconduct tickets, and Defendant Smith wrote the misconduct report, because of Plaintiff's grievances. Plaintiff merely alleges the ultimate fact of retaliation with respect to the issuance of the misconduct tickets. Again, such conclusory allegations are insufficient to state a plausible retaliation claim. *See Harbin-Bey*, 420 F.3d at 580. Accordingly, Plaintiff's First Amendment retaliation claims premised upon the issuance of misconduct tickets will be dismissed.

### d.    Transfers

Next, Plaintiff alleges that he was retaliated against for filing grievances when Defendants Findlay and Town transferred him from Unit B to Unit G, and when Defendants Ray, Fleisher, and Pierce had him transferred from Level I at DRF to Level II at MCF. (Compl., ECF No. 1, PageID.10–11.)

First, with respect to Plaintiff's transfer to MCF, typically, transfers to the general population of another prison are not an adverse action. *See Smith v. Yarrow*, 78 F. App'x 529, 543 (6th Cir. 2003) (collecting cases). However, in *Hill v. Lappin*, the Sixth Circuit held that transfer from general population to administrative segregation or another prison's lock-down unit can be

sufficient to constitute adverse action. *Hill*, 630 F.3d at 474–75. The *Hill* court determined that transfer to a lockdown unit at another facility is more than just a transfer, and is more akin to the transfer in *Siggers-El v. Barlow*, 412 F.3d 693, 701–02 (6th Cir. 2005), in which the consequence of transfer would affect the prisoner's ability to pay his lawyer, thereby affecting his access to the courts. Further, in *Pasley v. Conerly*, 345 F. App'x 981 (6th Cir. 2009), the Sixth Circuit held that a threat to have a prisoner moved out of the unit so that he would lose his job, together with a threat to influence the warden to have the prisoner transferred to another institution far from his family, were sufficiently adverse to be actionable. *Id.* at 985.

Here, although Plaintiff alleges that he was transferred from a Level I to a Level II facility, he does not allege that he was transferred to a lock-down unit at MCF or that the conditions of confinement at MCF were not comparable to those at DRF. Moreover, although Plaintiff states that the transfer to MCF "move[d] him further and further away from his family and friends," nowhere in Plaintiff's complaint does he allege facts suggesting that Defendants Ray, Fleisher, and Pierce knew that the transfer would place Plaintiff farther from his family. Nor does he allege facts suggesting that the transfer was motivated by his grievance activity. Plaintiff's First Amendment retaliation claims premised upon his transfer to MCF will, therefore, be dismissed.

Plaintiff also contends that Defendants Findlay and Town transferred him to Unit G from Unit B at DRF to retaliate against him for his grievances. Plaintiff, however, alleges no facts to suggest that Unit G was different from Unit B, other than the fact that Unit G had low water pressure. Under the circumstances alleged by Plaintiff, the Court concludes that Plaintiff's transfer from Unit B to Unit G did not constitute adverse action. Moreover, nowhere does Plaintiff allege facts from which the Court could infer that Defendants Findlay and Town transferred him to Unit

G because of his grievance activity. Plaintiff's First Amendment retaliation claims premised upon his transfer to Unit G will, therefore, also be dismissed.

### e.  Strip Search

Finally, Plaintiff contends that he was subjected to a strip search on April 17, 2024. (Compl., ECF No. 1, PageID.10.) He alleges that half of the unit was subjected to this search, and that the search was retaliatory. (*Id.*)

The Sixth Circuit has noted that a strip search can constitute adverse action in certain circumstances. *See Campbell v. Mack*, 777 F. App'x 122, 135 (6th Cir. 2019). Even if the Court were to assume that the strip search in question constitutes adverse action, Plaintiff's complaint is wholly devoid of any allegations of retaliatory motive. Although Plaintiff alleges that Defendant Nevins was part of the team conducting the strip searches, he wholly fails to allege facts suggesting that Defendant Nevins and the other involved officers conducted the strip searches because of any grievances Plaintiff had previously filed. Because Plaintiff's contention that the strip search was retaliatory is wholly conclusory, any First Amendment retaliation claims based upon the strip search will be dismissed.

### d.  Fourth Amendment Claims

Plaintiff suggests that Defendants violated his Fourth Amendment rights. While Plaintiff does not explain the nature of his Fourth Amendment claims, the Court presumes that he bases such claims on his allegations concerning excessive shakedowns of his cell.

In *Hudson v. Palmer*, 468 U.S. 517 (1984), the United States Supreme Court considered and rejected a Fourth Amendment claim based upon a prison official searching a prisoner's cell and destroying some of his legal papers in the process. *Id.* at 519, 535. The prisoner claimed that the prison official's conduct constituted an unreasonable search and seizure of his property, in violation of the Fourth Amendment. *Id.* at 530. The Supreme Court disagreed.

23

First, the Supreme Court recognized that while prisoners are not beyond the reach of the Constitution, "curtailment of certain rights is necessary, as a practical matter, to accommodate a 'myriad of institutional needs and objectives' of prison facilities, . . . chief among which is internal security." *Id.* at 523–24 (internal citation omitted). The Supreme Court then determined that the official's search of the prisoner's cell did not violate the Fourth Amendment because "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell." *Id.* at 526. According to the Court, "[a] right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." *Id.* at 527–28. For similar reasons, the Supreme Court held that the Fourth Amendment "does not protect against seizures in a prison cell." *Id.* at 528 n.8. According to the Court, "[p]rison officials must be free to seize from cells any articles which, in their view, disserve legitimate institutional interests." *Id.*

Under the circumstances set forth in Plaintiff's complaint, and applying *Hudson*, the Fourth Amendment did not prohibit the shakedowns of Plaintiff's cell. Accordingly, Plaintiff's Fourth Amendment claims will be dismissed.

### e.      Eighth Amendment Claims

Plaintiff next contends that all of the Defendants who were involved in the numerous shakedowns of his cell (Defendants Findlay, A. Town, Smith, Durga, McNeil, Melius, Hord, Cook, Silvhy, Henderson, Has, Denz, Haggerty, and Allen) violated his Eighth Amendment rights by conducting those shakedowns. (Compl., ECF No. 1, PageID.13.)

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The

Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347). As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)) (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." *Id.* at 837. "[I]t is enough that the official acted or failed to act despite his knowledge

25

of a substantial risk of serious harm." *Id.* at 842. "It is, indeed, fair to say that acting or failing to

act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent

of recklessly disregarding that risk." *Id.* at 836. "[P]rison officials who actually knew of a

substantial risk to inmate health or safety may be found free from liability if they responded

reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

The Court is sympathetic to Plaintiff's frustration over the numerous shakedowns of his

cell, some of which led to the destruction of some of his personal property. However, such conduct

does not rise to the level of cruel and unusual punishment that violates the Eighth Amendment.

*See, e.g.*, *Roper v. Johnson*, No. 2:19-cv-2061, 2020 WL 224601, *2-3 (N.D. Ohio Jan. 15, 2020)

(dismissing prisoner's claim that search of his cell and destruction of his property constituted cruel

and unusual punishment); *Williams v. Washington*, No. 2:18-cv-144, 2018 WL 6190497, *12

(W.D. Mich. Nov. 28, 2018) (concluding that frequent cell searches and pat downs did not rise to

the level of an Eighth Amendment violation). "Frequent cell searches alone, while perhaps

annoying, do not present a danger to the inmate's health or safety and do not implicate the Eighth

Amendment." *King v. Fender*, No. 1:22-cv-1372, 2022 WL 17082065, at *3 (N.D. Ohio Nov. 18,

2022). Plaintiff's Eighth Amendment claims premised upon excessive cell shakedowns and

searches will, therefore, be dismissed.

### f.      Fourteenth Amendment Claims

#### i.      *Refusal to Provide Copies*

Plaintiff suggests that Defendants Kissell and Hitchingham violated his Fourteenth

Amendment due process rights by refusing to provide copies of his grievance. (Compl., ECF No.

1, PageID.12.) The refusal to provide copies simply does not rise to the level of a Fourteenth

Amendment due process violation. *Cf. Walker v. Tyszkieurcy*, No. 89-2327, 1990 WL 104895, at

*1 (6th Cir. July 26, 1990) (affirming the dismissal of a prisoner's claim that he was denied due

process when officers refused to provide him copies of his institutional file). Plaintiff's Fourteenth Amendment due process claims against Defendants Kissell and Hitchingham will, therefore, be dismissed.

### ii. Deprivation/Destruction of Property

In his complaint, Plaintiff contends that during the shakedowns of his cell, officers destroyed his personal property by punching holes in coffee bags and "cool-aid bags." (Compl., ECF No. 1, PageID.8.) Plaintiff also suggests that officers "destroy[ed] and ripp[ed] apart binder/folder(s) that had only religious material in it, etc." (*Id.*)

Plaintiff's complaint can be construed to assert Fourteenth Amendment procedural due process claims based upon the deprivation of these items of personal property. Any such claims, however, are barred by the doctrine of *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986). Under *Parratt*, an individual deprived of property by a "random and unauthorized act" of a state employee cannot maintain a federal due process claim unless the state fails to afford an adequate post-deprivation remedy. If an adequate post-deprivation remedy exists, the deprivation, while real, is not "without due process of law." *Id.* at 537. This doctrine applies to both negligent and intentional deprivations of property, as long as the deprivation was not pursuant to an established state procedure. *See Hudson v. Palmer*, 468 U.S. 517, 530–36 (1984). Plaintiff must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland*, 57 F.3d at 479–80; *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993). The Sixth Circuit has noted that a prisoner's failure to sustain this burden requires dismissal of his § 1983 due process action. *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985).

Here, Plaintiff fails to allege that his state post-deprivation remedies are inadequate. Plaintiff has available to him numerous state post-deprivation remedies. First, a prisoner who

incurs a loss through no fault of his own may petition the institution's Prisoner Benefit Fund for compensation. MDOC Policy Directive 04.07.112, ¶ B (eff. Apr. 26, 2021); MDOC Policy Directive 04.02.110, ¶ E (eff. Nov. 1, 2017). Moreover, aggrieved prisoners may submit claims for property loss of less than $1,000.00 to the State Administrative Board. Mich. Comp. Laws. § 600.6419; MDOC Policy Directive 03.02.131 (eff. Mar. 27, 2017). Finally, Michigan law authorizes actions in the Court of Claims asserting tort or contract claims "against the state and any of its departments or officers." Mich. Comp. Laws § 600.6419(1)(a). The Sixth Circuit has specifically held that Michigan provides adequate post-deprivation remedies for deprivation of property. *See Copeland*, 57 F.3d at 480. Plaintiff fails to allege any reasons why a state court action would not afford him complete relief for the deprivations, either negligent or intentional, of his personal property. Plaintiff, therefore, Plaintiff fails to state Fourteenth Amendment due process claims regarding the deprivation of his property, and such claims will be dismissed.

### iii.   *Misconduct Proceedings*

In his complaint, Plaintiff contends that Defendants Findlay and Fleisher reviewed Plaintiff on various misconduct tickets and refused to provide him appeal forms to challenge the misconducts. (Compl., ECF No. 1, PageID.9.) Plaintiff suggests further that Defendant Smith lied on one misconduct report. (*Id.*) Plaintiff also alleges that Defendant Findlay denied him a misconduct hearing and gave Plaintiff 20 days' LOP just for asking for a hearing. (*Id.*) The Court construes Plaintiff's complaint to assert Fourteenth Amendment procedural due process claims premised upon these misconducts.

A prisoner does not have a protected liberty interest in prison disciplinary proceedings unless the sanction "will inevitably affect the duration of his sentence" or the resulting restraint imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of

prison life." *See Sandin v. Conner*, 515 U.S. 472, 484, 487 (1995). Under MDOC Policy Directive 03.03.105 ¶ C (eff. Apr. 18, 2022), a class I misconduct is a "major" misconduct and class II and III misconducts are "minor" misconducts. The policy further provides that prisoners are deprived of good time or disciplinary credits only when they are found guilty of a class I misconduct. *Id*. ¶ DDDD.

As an initial matter, Plaintiff provides no facts regarding the nature of the misconducts he received. In any event, Plaintiff does not allege that these misconduct convictions had any effect on the duration of his sentence—and he cannot. Plaintiff is serving sentences imposed in 2015 for crimes committed in 2014. *See* Offender Tracking Information System (OTIS), https://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber=522370 (last visited Aug. 12, 2024). For a prisoner like Plaintiff, who is serving a sentence for an offense committed after 2000, even a major misconduct conviction results only in the accumulation of "disciplinary time." Mich. Comp. Laws § 800.34. Disciplinary time is considered by the Michigan Parole Board when it determines whether to grant parole. *Id.* § 800.34(2). It does not necessarily affect the length of a prisoner's sentence because it is "simply a record that will be presented to the parole board to aid in its [parole] determination." *Taylor v. Lantagne*, 418 F. App'x 408, 412 (6th Cir. 2011). Therefore, any misconduct convictions had no impact on the duration of Plaintiff's sentence.

Furthermore, Plaintiff does not allege any facts suggesting that the misconduct convictions resulted in an "atypical and significant hardship." *See Sandin*, 515 U.S. at 487. Plaintiff suggests that Defendant Findlay gave him 20 days' LOP for one of the misconducts. Pursuant to MDOC Policy Directive 03.03.105, the "loss of privileges" sanction involves the loss of various privileges, such as access to the day room, exercise facilities, group meetings, "[o]ut of cell hobbycraft activities," the kitchen area, the general library (not including the law library), movies, music

practice, and other "[l]eisure time activities." MDOC Policy Directive 03.03.105, Attach. E. Where a stay longer than 30 days in segregation is not considered an atypical or significant hardship, *see Joseph v. Curtin*, 410 F. App'x 865, 868 (6th Cir. 2010), it defies logic to suggest that the lesser penalty of loss of privileges for that duration could be atypical or significant. Sixth Circuit authority bears that out. *See Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004) (holding that a fourteen-day loss of privileges sanction did not implicate the due process clause); *Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir. 2003) (nine-month loss of package privileges did not impose an atypical and significant hardship); *Alexander v. Vittitow*, No. 17-1075, 2017 WL 7050641, at *3 (6th Cir. Nov. 9, 2017) (concluding that "thirty days' loss of privileges . . . did not implicate a protected liberty interest"); *Langford v. Koskela*, No. 16-1435, 2017 WL 6803554, at *3 (6th Cir. Jan. 24, 2017) (thirty days' toplock and thirty days' loss of privileges "does not amount to an 'atypical and significant hardship'").

Plaintiff fails to allege any facts suggesting that he was subjected to conditions that would implicate a liberty interest as a result of the misconduct tickets. Plaintiff's Fourteenth Amendment procedural due process claims premised upon those tickets will, therefore, be dismissed.

### iv.      Transfer to MCF

Plaintiff's complaint can be construed to assert Fourteenth Amendment due process claims premised upon his transfer from DRF to MCF. However, the Supreme Court repeatedly has held that a prisoner has no constitutional right to be incarcerated in a particular facility or to be held in a specific security classification. *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983); *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976). While it is clear that Plaintiff did not want to be transferred to MCF and believes that his placement there could have a negative effect on his parole hearing, Plaintiff has not suggested that his placement at MCF was an atypical and significant deprivation.

For these reasons, Plaintiff fails to state Fourteenth Amendment due process claims premised upon his transfer to MCF.

### v.       *Denial of Jobs and Vocational Programs*

In his complaint, Plaintiff vaguely mentions that he was denied institutional employment as well as college and vocational programs while at DRF. (Compl., ECF No. 1, PageID.11.) However, any purported Fourteenth Amendment due process claims premised upon this allegation fail because "no prisoner has a constitutional right to a particular job or to any job." *See Ivey*, 832 F.2d at 955; *see also Argue*, 80 F. App'x at 429 (discussing that prisoners have no constitutional right to rehabilitation, education or jobs); *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989) (holding that there is no constitutional right to prison employment). Accordingly, any purported Fourteenth Amendment due process claims premised upon the denial of jobs and vocational programs will be dismissed.

### vi.      *Expectation of Parole*

Throughout his complaint, Plaintiff suggests that Defendants' actions, including transferring him from a Level I to a Level II facility, had the potential to negatively affect Plaintiff's upcoming parole hearing.

To the extent Plaintiff raises Fourteenth Amendment due process claims premised upon his assertions regarding parole, there is no constitutional or inherent right to be conditionally released before the expiration of a prison sentence. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). Although a state may establish a parole system, it has no duty to do so; thus, the presence of a parole system by itself does not give rise to a constitutionally protected liberty interest in parole release. *Id.* at 7, 11; *Board of Pardons v. Allen*, 482 U.S. 369, 373 (1987). Rather,

a liberty interest is present only if state law entitles an inmate to release on parole. *Inmates of Orient Corr. Inst. v. Ohio State Adult Parole Auth.*, 929 F.2d 233, 235 (6th Cir. 1991).

In *Sweeton v. Brown*, 27 F.3d 1162, 1164–65 (6th Cir. 1994) (en banc), the United States Court of Appeals for the Sixth Circuit, noting "the broad powers of the Michigan authorities to deny parole," held that the Michigan system does not create a liberty interest in parole. The Sixth Circuit reiterated the continuing validity of *Sweeton* in *Crump v. Lafler*, 657 F.3d 393, 404 (6th Cir. 2011). In *Crump*, the Sixth Circuit held that the adoption of specific parole guidelines since *Sweeton* does not lead to the conclusion that parole release is mandated upon reaching a high probability of parole. *See id.*; *see also Carnes v. Engler*, 76 F. App'x 79, 80 (6th Cir. 2003). In addition, the Sixth Circuit has rejected the argument that the Due Process Clause is implicated when changes to parole procedures and practices have resulted in incarcerations that exceed the subjective expectation of the sentencing judge. *See Foster v. Booker*, 595 F.3d 353, 369 (6th Cir. 2010). Finally, the Michigan Supreme Court has recognized that there exists no liberty interest in parole under the Michigan system. *Glover v. Mich. Parole Bd.*, 596 N.W.2d 598, 603–04 (Mich. 1999).

Given this authority, Plaintiff has no reasonable expectation of liberty until he has served his maximum sentence. The discretionary parole system in Michigan holds out "no more than a mere hope that the benefit will be obtained." *Greenholtz*, 442 U.S. at 11. Thus, any alleged interference by Defendants with Plaintiff's parole prospects does not implicate a federal right. Accordingly, any Fourteenth Amendment procedural due process claims regarding Plaintiff's opportunity for parole will be dismissed.

### vii.    *Substantive Due Process*

Plaintiff's reference to the Fourteenth Amendment may also assert substantive due process claims. "Substantive due process 'prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty.'" *Prater v. City of Burnside*, 289 F.3d 417, 431 (6th Cir. 2002) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). "Conduct shocks the conscience if it 'violates the decencies of civilized conduct.'" *Range v. Douglas*, 763 F.3d 573, 589 (6th Cir. 2014) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998)). With respect to an allegedly falsified misconduct report, the Sixth Circuit has held that framing an inmate by planting evidence may violate substantive due process where a defendant's conduct shocks the conscience and constitutes an "egregious abuse of governmental power." *Cale v. Johnson*, 861 F.2d 943, 950 (6th Cir. 1988), *overruled in other part by Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999). Plaintiff's complaint, however, has no allegations from which the Court could infer that any of the named Defendants acted to frame Plaintiff.

Moreover, "[w]here a particular [a]mendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that [a]mendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273–75 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)) (holding that the Fourth Amendment, not substantive due process, provides the standard for analyzing claims involving unreasonable search or seizure of free citizens). If such an amendment exists, the substantive due process claim is properly dismissed. *See Heike v. Guevara*, 519 F. App'x 911, 923 (6th Cir. 2013). In this case, the First and Eighth Amendments apply to

Plaintiff's claims for relief. Consequently, any intended substantive due process claims will be dismissed.

B.      **State Law Claims**

Plaintiff suggests further that Defendants committed negligence under state law, and that their actions violated the Michigan Constitution. Claims under § 1983 can only be brought for "deprivations of rights secured by the Constitution and laws of the United States." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982). Section 1983 does not provide redress for violations of state law. *See Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995).

In determining whether to retain supplemental jurisdiction over state law claims, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993); *see also Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("Residual jurisdiction should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues." (internal quotation marks omitted)). Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).

Here, the Court has dismissed all of Plaintiff's federal claims against all Defendants. Accordingly, the Court will decline to exercise supplemental jurisdiction over Plaintiff's state law claims, and such claims will be dismissed without prejudice to Plaintiff's ability to bring those claims in state court.

**Conclusion**

The Court will deny Plaintiff's motion to appoint counsel. (ECF No. 5.) Moreover, having conducted the review required by the PLRA, the Court determines that Plaintiff's federal claims will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). Plaintiff's state law claims will be dismissed without prejudice because the Court declines to exercise supplemental jurisdiction over such claims.

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). Although the Court concludes that Plaintiff's claims are properly dismissed, the Court does not conclude that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court does not certify that an appeal would not be taken in good faith. Should Plaintiff appeal this decision, the Court will assess the $605.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610–11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $605.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.


Dated:   September 17, 2024                          /s/ Ray Kent
                                                      Ray Kent
                                                      United States Magistrate Judge